AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
FEB 4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| John C. Fry, | ) | Case No. |
| | ) | 3 19 70178 |
| | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __from May 2018 to June 2018__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated: See attachment.

_Code Section_ — _Offense Description_
31 U.S.C. § 5322(a) — Unauthorized disclosure of suspicious activity reports.

Approved as to form:
_/s/_
AUSA Kimberly Hopkins

UNDER SEAL

This criminal complaint is based on these facts:
See attached AFFIDAVIT in support of criminal complaint.

☑ Continued on the attached sheet.

_Complainant's signature_
Linda Cieslak, Special Agent - TIGTA
_Printed name and title_

Sworn to before me and signed in my presence.

Date: Feby 4, 2019

_Judge's signature_

City and state: San Francisco, California
Hon. Laurel Beeler, U.S. Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR A CRIMINAL COMPLAINT

I, Linda Cieslak, Special Agent of the U.S. Department of Treasury, Treasury Inspector General for Tax Administration, being duly sworn, do declare and state:

## INTRODUCTION

1. I make this affidavit in support of a criminal complaint for John C. FRY for the unauthorized disclosure of suspicious activity reports, in violation of 31 U.S.C. § 5322(a).

2. I am a Special Agent with the U.S. Department of Treasury, Treasury Inspector General for Tax Administration ("TIGTA"), and have been since May 2018. I am assigned to the Western Field Division in Oakland, California. My duties and responsibilities include investigations of fraud, waste, and abuse related to the Internal Revenue Service ("IRS"). My duties also include investigations of IRS personnel for criminal and administrative violations relating to Internal Revenue Laws (Title 26 of the United States Code) and various criminal offenses related to Title 18 of the United States Code.

3. My academic qualifications include a Masters of Accounting degree, with an emphasis in Information Assurance, from the University of New Mexico. I am a Certified Public Accountant ("CPA") in the state of California. My professional training includes completion of the intensive Criminal Investigator Training Program ("CITP") at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. The CITP included training in the fields of Administrative Law, Federal Criminal Law, Courtroom Testimony, Evidence, Documentation, Report Writing, and Investigative Techniques. Prior to my employment as a Special Agent, I was employed as an Information Technology Auditor with TIGTA's Office of Audit for approximately two years. In this position, I was responsible for the oversight of the IRS's information technology systems security. Additionally, I have completed forensic accounting internships for the United States Securities and Exchange Commission and the United States Attorney's Office for the District of New Mexico.

4. The facts in this affidavit come from my personal participation in this investigation, my training and experience, and information obtained from other agents and

witnesses. Statements of individuals are set forth as summaries unless otherwise indicated. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that FRY has committed the unauthorized disclosure of suspicious activity reports, in violation of 31 U.SC. § 5322(a).

## LEGAL BACKGROUND

6. The Financial Crimes Enforcement Network ("FinCEN") is a bureau of the United States Department of Treasury that collects and analyzes information about financial transactions. FinCEN's mission is to "safeguard the financial system from illicit use and combat money laundering and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities."[1] Among other things, FinCEN manages the collection and maintenance of Suspicious Activity Reports ("SARs"). Under the Bank Secrecy Act ("BSA"), United States financial institutions and other parties are required by law to generate SARs in order to report potentially suspicious financial transactions, and to deliver SARs to FinCEN. FinCEN in turn maintains a centralized database of the SAR data, which it makes available to law enforcement pursuant to regulations and procedures that protect the confidentiality of the information.

7. Under the BSA and its implementing regulations, the disclosure of a SAR or its contents is unlawful. Specifically, 31 C.F.R §1020.320(e) provides that "[a] SAR, and any information that would reveal the existence of a SAR, are confidential and shall not be disclosed except as authorized [by law]." Subsection 1020.320(e)(2) prohibits employees or agents of government authorities from "disclos[ing] a SAR, or any information that would reveal the existence of a SAR, except as necessary to fulfill official duties consistent with Title II of the Bank Secrecy Act." Title 31, United States Code, Section 5322(a) imposes criminal penalties for

---

[1] https://www.fincen.gov/about/mission

2

willful violations of the BSA and its implementing regulations, including the disclosure of a SAR.

## STATEMENT OF PROBABLE CAUSE

**A.    Introduction**

8.    TIGTA is investigating a series of unauthorized disclosures of SARs and SAR information that appeared in the media in May of 2018. Specifically, SAR information regarding Michael Cohen appeared in the Washington Post on May 7, 2018 and in the New Yorker on May 16, 2018.

9.    As described in more detail below, there is probable cause to believe that the unauthorized disclosure of SARs and SAR information were made by John FRY, an Investigative Analyst for the IRS's law enforcement arm, the Criminal Investigation Division ("CI"). FRY has worked for the IRS since 2008 and currently works in the San Francisco office. His current responsibilities include supporting IRS Agents in the Northern District of California area and reviewing SARs for activity that could potentially lead to a criminal investigation. In this position, he has access to various law enforcement databases, including FinCEN, Palantir, which is an analytic software used by CI to integrate investigative data from multiple internal and external data sources, and the Integrated Data Retrieval System ("IDRS"), which is a database containing tax information.

**B.    Overview of FRY's Access to and Unlawful Disclosure of SARs**

10.    On May 4, 2018, John FRY logged onto the Palantir database from his work computer and conducted numerous searches related to Michael Cohen, the then-personal attorney of Donald Trump. At approximately 2:54 p.m., FRY accessed and downloaded five SARs, according to file data from a Palantir download found on FRY's work computer. I reviewed the five SARs and learned the following[2]:

---

[2] I confirmed that the SAR information set forth below appeared in media reports in May of 2018.

3

a.      SAR Identification Number **********1234 ("SAR 1234"): First Republic Bank filed SAR 1234. The SAR pertained to continuing suspicious activity involving a bank account opened for Essential Consultants LLC. The SAR revealed that Michael Cohen completed the paperwork to open the account and noted Cohen as the listed owner of Essential Consultants, a real estate consulting company. Cohen stated that the primary source of funds would be from United States or United States based companies, there would be no outgoing wire transfers, and that he expected no more than 20 credits totaling $10,000 a month. The SAR revealed numerous suspicious credits to the bank account, including a payment from Korea Aerospace Industries for $150,000, four payments from AT&T totaling $200,000, four payments from Novartis Investments totaling $399,920, and eight payments from Columbus Nova totaling $500,000. The SAR noted that Columbus Nova is a company affiliated with a Russian Oligarch that donated money to President Trump's inauguration fund in January 2017. During the course of the investigation, I learned that the SAR was a continuation of two SARs previously filed by First Republic Bank about Essential Consultants, SAR Identification Number **********8133 ("SAR 8133") and another SAR with an unmentioned SAR number. I learned this additional SAR to be number **********9426 ("SAR 9426"). The suspicious activity across the three SARs which occurred from October 2016 to January 2018, totaled $4,425,033.46.

b.      SAR Identification Number **********0026 ("SAR 0026"): City National Bank filed SAR 0026. The SAR discussed an account maintained by K.D. The SAR noted that on October 27, 2016, K.D. received an incoming wire from Essential Consultants totaling $130,000. The SAR also discussed four additional wire transfers K.D. received from E.B. totaling $387,500.

c.      SAR Identification Number **********9342 ("SAR 9342"): JP Morgan Chase Bank filed SAR 9342. The SAR noted the October 27, 2016 wire for $130,000 from Essential Consultants to K.D.'s City National Bank account.

d.      SAR Identification Number **********3016 ("SAR 3016"): Morgan Stanley Smith Barney, LLC, filed SAR 3016. The SAR discussed two accounts maintained by

4

Cohen. The SAR noted that from July 13, 2017 through September 8, 2017, Cohen deposited three checks in the amounts of $505,000, $250,000, and $250,000 into his accounts. The checks were remitted from an account held at First Republic Bank in the name of Essential Consultants, LLC.

    e. SAR Identification Number **********1841 ("SAR 1841"): Standard Chartered Bank filed SAR 1841. The SAR discussed possible fraudulent and illegal financial transactions by Michael Cohen, during 2016 and 2017, in Singapore, Hungary, Malaysia, Canada, Taiwan, Kenya, and Israel.

  11. Immediately after downloading the five SARs, John FRY placed two outgoing calls from his personal cellphone to (***) ***-4118. The first phone call at 3:11 p.m. lasted approximately four minutes. The second phone call at 3:15 p.m. lasted approximately seven and a half minutes. A records check revealed that the phone number was associated with Michael Avenatti, an attorney based in Newport Beach, California.

  12. Shortly thereafter, at approximately 3:38 p.m., FRY logged onto the FinCEN database from his work computer and conducted additional searches related to Michael Cohen. I reviewed FRY's FinCEN system logs from May 4, 2018. The FinCEN system logs showed the SAR information FRY accessed, the search terms he used to access the information, and the dates and times of access. I learned that FRY first conducted a "quick search" for SAR 8133, and that the SAR was listed as unavailable in the system. During the course of the investigation, I learned that SAR 8133 filed on October 4, 2017, and SAR 9426 filed on June 16, 2017, were given "restricted access" on the FinCEN System in October and August 2017, respectively, because they were related to a sensitive open investigation. I also learned that "restricted access," means that a SAR is not available for viewing by registered users in the FinCEN system. Instead, a user must already know of a SAR's existence and contact FinCEN with a justification to view the SAR information. While the quick search did not produce SAR 8133, the search produced a related SAR, SAR 1234, which FRY accessed. FRY also appeared to use personal identifying information contained in SAR 1234 to conduct additional targeted searches on

5

FinCEN, including searches using Cohen's driver's license and personal bank account numbers, and bank account numbers for Korea Aerospace, Essential Consultants, and Real Estate Attorneys.

13. On May 7, 2018, FRY logged onto the FinCEN database from his work computer and conducted another "quick search" for SAR 8133. Again, FRY was unable to access SAR 8133 because it was restricted. FRY then conducted a general search related to Cohen and Essential Consultants. FRY appeared to browse the search results, but did not view a particular SAR at that time. Minutes later, FRY searched specifically for SARs filed by First Republic Bank on October 4, 2017. From this search, FRY viewed a SAR filed by First Republic Bank on October 4, 2017, that was unrelated to Essential Consultants. FRY then conducted searches using First Republic Bank's tax employee identification number, Essential Consultants' tax employee identification number, the term Essential Consultants, Cohen's social security number, and variations of the term First Republic. FRY also searched for SARs filed by First Republic Bank between October 4 and October 6, 2017.

14. Later that afternoon, according to telephone records I reviewed, FRY placed an outgoing phone call from his personal cellphone to Michael Avenatti. The call lasted more than six minutes.

15. On May 8, 2018, Michael Avenatti used his public Twitter account to circulate a dossier releasing confidential banking information related to Cohen and his company Essential Consultants. The Tweet read, "The Executive Summary from our first Preliminary Report on Findings may be accessed via the link below. Mr. Trump and Mr. Cohen have a lot of explaining to do." After reviewing the dossier, I learned that it discussed the same suspicious activity detailed in the five SARs accessed and downloaded by FRY on May 4, 2018. For instance, the dossier reported that on October 27, 2016, Cohen wired $130,000 from the Essential Consultant's bank account at First Republic Bank to K.D. The dossier also noted the complex set of transactions involving Essential Consultant's bank account, including credits to Essential Consultants' bank account from Korea Aerospace, AT&T, Novartis Investments, and

6

Columbus Nova, and detailed payments from Essential Consultants' bank account to Cohen's personal bank account at Morgan Stanley.

16. On May 8, 2018, the Washington Post published an article titled "How Much Flowed Through Michael Cohen's Multi-Purpose Shell Company." The article discussed in detail the claims about Cohen's banking history made public in Avenatti's dossier. The article noted that Avenatti declined to reveal the source of his information, stating: "The source or sources of our information is our work product, and nobody's business. . . .They can investigate all they want, but what they should be doing is releasing to the American public the three Suspicious Activity Reports filed on Michael Cohen's account. . . .Why are they hiding this information?"

17. On May 12, 2018, FRY placed an outgoing phone call from his personal cellphone to telephone number (\*\*\*) \*\*\*-3750. The call began at 1:30 p.m. and lasted approximately 42 minutes. A records check revealed that the phone number is associated with Reporter-1.

18. Between May 12, 2018 and June 8, 2018, FRY and Reporter-1 exchanged 57 WhatsApp messages. Based on my training and experience, I know WhatsApp is a messaging and Voice over Internet Protocol (VoIP) service that allows users to create an account associated with their phone number. The service provides end-to-end encryption for users to send text messages, voice calls, video calls, images and other media, documents, and user location. On May 14, 2018, Reporter-1 sent FRY the following WhatsApp messages[3]:

---

[3] On November 27, 2018, I obtained a federal search warrant for FRY's cellphone. See CR 18-71636-MISC-TSH (N.D. Cal.). A forensic image of FRY's cellphone revealed a phone number listed in the contacts section under the name of Reporter-1. The forensic image also revealed communications between FRY and Reporter-1 via WhatsApp. I learned that both FRY and Reporter-1 appeared to be using WhatsApp IDs that corresponded to their telephone numbers.

7

| | |
|---|---|
| 5/14/18, 8:37 AM – Reporter 1: | "Let's all keep talking about the full reveal of your story, and I will keep you updated on the more immediate story about the missing SARs where I'm quoting you anonymously in the mean time." |
| 5/14/18, 8:38 AM – Reporter 1: | "(This is a few days old but I assume you noticed the Inspector General said they're looking into how the info got out, so maybe another point in the "pro" column for coming out guns blazing to get ahead of this.)" |

19.   Later that day, Reporter-1 and FRY exchanged the following WhatsApp messages:

| | |
|---|---|
| 5/14/18, 4:01 PM – Reporter-1: | "Hi there – do you have a few minutes for a call in the next few hours? Want to run this article by you so you know exactly what's going on at every step of this." |
| 5/14/18, 4:02 PM – John C Fry: | "Getting to leave the office in about 10 minutes. I can give you a call when I am in a more secure location, if that works for you." |

20.   On May 16, 2018, the New Yorker published an article written by Reporter-1 titled, "Missing Files Motivated the Leak of Michael Cohen's Financial Records." The article addressed the speculation about who leaked Cohen's confidential banking documents. The article reported that the source, identified only as a law enforcement officer, spoke to Reporter-1 to explain his/her motivation for the leak. The source claimed to have grown alarmed after being unable to find two important SARs regarding Cohen's financial activity in a government database. The source reportedly conducted an "exhaustive search" for the unavailable records and said, "This is a permanent record. They should be there, and there is nothing there." During the course of the investigation, I learned that the "two important SARs" that FRY was referring to (SARs 8133 and 9426), had been granted restricted access. As such, the SARs were not available for viewing by FRY and/or other registered users in the FinCEN system. In order to view the SAR, FRY would have to contact FinCEN with a justification to view the SAR information.

8

21. On May 16, 2018 at 4:03 p.m., Reporter-1 sent FRY a WhatsApp message containing a link to the New Yorker article. FRY later responded:

5/16/18, 4:15 PM – John C Fry: "Thank you Thank you Thank you"

5/16/18, 4:16 PM – John C Fry: "Beautifully written, as I suspected it would be"

22. On or about October 4, 2018, I interviewed FRY's supervisor and learned that FRY should not be handling SARs from other geographic regions, such as New York, and would have no official reason in his capacity as an Investigative Analyst in San Francisco to view SAR records related to Cohen or Essential Consultants. I also learned that when FRY (or any analyst) researches SARs for an official purpose, that search would occur in conjunction with a search for information regarding the subjects in the Integrated Data Retrieval System ("IDRS"). IDRS logs shows what, if any, tax information FRY accessed, the search terms he used to access the information, and the dates and times that he accessed the tax information. I reviewed FRY's IDRS system logs and learned that he never searched the database for Cohen, Clifford, or Essential Consultants.

23. FRY's supervisor also stated that FRY first mentioned that he observed "interesting" SARs related to Cohen in August of 2018. His supervisor instructed FRY to send the SAR information to the IRS CI Office in New York, which he did.

24. On November 26, 2018, Assistant Special Agent in Charge Jason Pritchard and I met with FRY at the IRS CI office in San Francisco. FRY was advised of his rights, and he agreed to waive his rights and make a verbal and written statement. FRY confessed to verbally providing SAR information to Avenatti. FRY also admitted that he sent Avenatti a screenshot of the narrative. FRY stated that Reporter-1 contacted him to verify the information supplied to Reporter-1 by Avenatti.

## CONCLUSION

25. Based on the above facts and based on my training and experience, I believe there is probable cause that John FRY, an employee of a federal government authority, violated 31

U.S.C. § 5322(a) and C.F.R. § 1020.320(a)(2) (unauthorized disclosure of suspicious activity reports).

26.  I respectfully request that this Complaint, any warrant issued pursuant thereto, and any related records, be filed under seal until further order of the Court as the investigation is ongoing. An application and proposed sealing order is submitted herewith.

LINDA CIESLAK
Special Agent
U.S. Department of Treasury,
Treasury Inspector General for Tax Administration

Sworn to and subscribed before me on ___Feb 4___, 2019.

HON. LAUREL BEELER
United States Magistrate Judge

10