GAIL SHIFMAN (State Bar No. 147334)
Law Office of Gail Shifman
2431 Fillmore Street
San Francisco, California 94115-1814
Telephone:     (415) 551-1500
Facsimile:      (415) 551-1502
Email:          gail@shifmangroup.com

Attorney for Defendant
JOHN FRY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.:  CR 3-19-0102 EMC |
| Plaintiff, | ) |
| | ) **DEFENDANT'S SENTENCING** |
| | ) **MEMORANDUM AND REQUEST TO** |
| vs. | ) **FILE EXHIBIT B UNDER SEAL** |
| | ) |
| JOHN FRY, | ) Date:  January 14, 2010 |
| | ) Time: 2:30 p.m. |
| Defendant. | ) |
| _____ | ) |

Defendant, JOHN FRY, by and through his attorney, Gail Shifman, files this Sentencing

Memorandum in advance of the sentencing hearing. Defendant joins in the Presentence Report's

(PSR) recommendation of a sentence of probation, a sentence that meets the goals of 18 U.S.C. §

3553(a).  Defendant urges the Court not to impose any location monitoring or a curfew.  And, in

imposing a fine, Defendant believes a fine at the low end of the guideline range, $2,000, is

appropriate, given that he is 55 years old, that his monthly income is modest (the income listed in

the PSR includes his boyfriend's income, PSR ¶ 62) and the nominal assets he has reflect those

saved for and needed for retirement.

**DEFENDANT'S SENTENCING MEMORANDUM**                                    1

**INTRODUCTION**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). This is why 18 U.S.C. § 3553(a) requires the Court consider "the nature and circumstances of the offense and the history and characteristics of the defendant," along with what sentence will "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(1) and (2)(D).

In determining the sentence, the Court is guided by the principle that it "shall impose a sentence sufficient but not greater than necessary" to meet the goals of sentencing. 18 U.S.C. § 3553(a); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).  To do this, the Court must consider the totality of the defendant's life, not just his failures but his successes too. The Court must ask – who is this person?  How did he come to be here?

John Fry made a terrible mistake when he committed this offense, done without a suggestion of financial pursuit or gain; he made a onetime mistake within a lifetime of good. The PSR recommendation of imposition of a sentence of probation recognizes the aberrant nature of Mr. Fry's conduct and is a sentence "sufficient but not greater than necessary" to meet the goals of sentencing.

**OBJECTIONS TO PSR**

Defendant has no objections to the guideline calculation contained in the PSR but does take issue with the first sentence in PSR ¶ 16, where it states that the agents interviewed Mr. Fry's supervisor "and learned that Fry should not be handling SARs from other geographic

**DEFENDANT'S SENTENCING MEMORANDUM** 2

regions… and would have no official reason in his capacity as an Investigative Analyst in San Francisco to view SAR records related to Cohen or Essential Consultants." [1]

In fact, SAR records often contain information about more than one subject or party and more than one geographic region.   PSR ¶ 16 itself contradicts this first sentence, above, when it states that "Fry's supervisor also stated that Fry first mentioned that he observed "interesting" SARs related to Cohen in August of 2018.  His supervisor instructed Fry to send the SAR information to the IRS CI Office in New York, which he did."

Thus, everyone acknowledges and admits that Mr. Fry, in his capacity as an Investigative Analyst in San Francisco, received SAR records relating to Cohen even though Cohen resided in New York.  During that  same agent interview of Mr. Fry's supervisor, she stated "if FRY finds a SAR lead in the Financial Crimes Enforcement Network (FinCEN) database he will research it further in the IRS's Integrated Data Retrieval System (I DRS) and other databases such as Accurint, then write a report."  The supervisor stated that "she believes the databases FRY has access to include I DRS, FinCEN, Accurint, the National Crime Information Center (NCIC), and IRS's Criminal Investigation Management Information System (CIMIS)."  Bates JF 00154. Thus, Mr. Fry, has the ability in the course of his official duties to roam through the databases and develop cases.  That was his job, as attested to by the numerous letters of his former co-workers, including Special Agents of the IRS-CI, attached as Exhibit A

And, the email which he sent on August 8, 2018 to Agent E. Paliska in the NY IRS-CI office confirmed that Mr. Fry had indeed received more than one SAR relating to Cohen.  The email stated as follows:

Elvis,

---

[1] On one other minor point, PSR ¶ 39 indicates that Mr. Fry's brother and family members are living with him in his apartment when, in fact, they lived with him temporarily following the wildfires.

In recent months, I have had 2 SARs hit the Bay Area download for your cases against Michael Cohen.  There are subjected listed that are located in the Bay Area, which is why they ended up here.

Though I am confident you have seen them, I am forwarding them along to you on the off chance they have missed your review.

Bates JF-00194.

Further work emails between Mr. Fry and Agent Paliska continued discussing a SAR report that Mr. Fry received in his download relating to Rick Gates that showed up because there were San Francisco based subjects also listed in that same SAR.  Just as he had with Cohen, Mr. Fry did his job through his databases attempting to determine whether there needed to be any follow up with any Special Agents for investigation.

FRY replied on August 28 at 2:56p.m:

"For the record, Rick Gates (Manafort's cohort), also showed up in my download this month, as there were San Francisco based subjects also listed on that same SAR. I noted in CIMIS, that there is NO tax investigation on Gates. He has addresses in NYC as well as Virginia. Are you aware of anyone looking at him? Copy of SAR is attached."

PALISKA replied at 2:59p.m.:

"I haven't heard of anyone looking into him but I have not had any contact with the DC field office".

FRY replied at 4:11 p.m.:

"No worries. I can reach out to the SAC there & see if they have anything going ... Given what Gates said on the stand, we should be looking at him. Keep up the great work."

Bates, JF00195.

Attached, under seal as Exhibit B, is an example of a SAR record (number ending in 1389), filed on July 24, 2018.  Bates JF-000158.  This SAR was a part of Mr. Fry's monthly download because at least one of the subjects had a Northern California zip code – Atherton.

Countless subjects addressed therein were in the public domain discussed in all forms of the media, including Cohen.

While the defense was unable to locate the first SAR in a meeting with the government that had come to Mr. Fry in his monthly download, it was this first SAR from which Mr. Fry began his search of the database because it was a continuing SAR, meaning that the SAR itself mentioned two other earlier SAR record numbers filed against Cohen.  It is these two earlier SAR record numbers that Mr. Fry could not locate.

And, despite the government's theories about what motivated Mr. Fry to search his work databases for these Cohen records, it is clear from the letters attached as Exhibit A, that Mr. Fry was motivated by a sincere desire to do his job well, something he did all the time.  And, despite his undeniable expertise about SAR records, when he encountered two SAR numbers that he could not locate, he had no explanation for why they could be missing because he personally did not know that SAR records could be walled off or secreted within the FinCEN system.  He had never been taught this or seen any literature describing this.  All he knew was that these two SARs were missing.  This coupled with his hunch, as it turns out, a correct hunch, that there was financial wrongdoing on the part of Cohen. Mr. Fry suspected a cover-up and it is at this point that his judgment failed him resulting in the charge in this case.

Rather than going up the chain of command or to determine the proper course to report what he found, Mr. Fry unfortunately contacted the wrong attorney, Michael Avenatti, to describe that SARs were missing.  Of course, at the time, Avenatti was a so-called media darling and someone that Mr. Fry had heard interviewed on numerous cable news programs.  And, in a terrible lapse of judgment, Mr. Fry sent Avenatti the SARs records he had located.  Regrettably, he actually thought that Avenatti was going to help him expose what he thought had been

wrongdoing.  When instead, Avenatti, issued a report containing the contents of the SARs information that Mr. Fry had provided to him and then went on a media blitz to publicize the information, Mr. Fry then immediately realized his grave mistake. His interview with Ronan Farrow in the New Yorker was his attempt to explain why he had done what he did.  It is from that article that he first learned that SARs could be 'walled-off' and inaccessible even to legitimate users of the FinCEN database.

Any ethical lawyer would have told Mr. Fry that he could NOT send them the SAR information or even disclose its contents during their phone call.  This is not, however, how Avenatti operated, and with Avenatti placing his interests above those of Mr. Fry, he now finds himself standing before the Court for sentencing.[2]

He doesn't appear before the Court with excuses because he solely undertook the disclosure of this information.  While Avenatti did not look out for him, or advise him of the proper course, Mr. Fry understands that his own actions are the reason he appears here. He, of course, wishes that things had been different, that he would have felt comfortable talking with his supervisor and running this up his chain of command but as the letters in Exhibit A attest, he worked in an hostile environment where his supervisor's actions felt arbitrary and personal. Nevertheless, he knows this doesn't excuse what he did.  He deeply regrets his actions and his lapse in good judgment.  He is deeply ashamed and regrets that he tarnished the reputation of the good men and women with whom he worked.

Mr. Fry will never commit another offense.  Mr. Fry will not again let the media get the best of him by allowing it to override his judgment.  He will continue to contribute to society as

---

[2] Media reports are plentiful with details of Avenatti' s wrongdoing as reflected in the criminal cases filed against him in the Central District of California and the Southern District of New York as well as proceedings before the State Bar of California.

**DEFENDANT'S SENTENCING MEMORANDUM**                                                          6

he has for most of his adult life.  He is a good, sensitive and earnest man who has paid a big price

for his lapse in judgment.

## JOHN FRY'S BACKGROUND AND CHARACTER

One of the most important sentencing factors that the Court must consider –

indeed, the starting point – is John Fry's history and characteristics. As the Honorable Richard J.

Sullivan said in sentencing a defendant found guilty after trial:

> Those factors include, as we have discussed in great detail, the facts and
> circumstances of the life of the individual. I am imposing a sentence on an
> individual who is unique, with a unique combination of experiences, decisions,
> just accidents of life, of good judgments, bad judgments, a lifetime worth of
> judgments. And so naturally that is the starting point for any sentence.

Sentencing Transcript at 52, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS) (S.D.N.Y.

Dec.17, 2010).   Judge Rakoff, of the Southern District of New York, similarly stated, in a 2006

sentencing of a white-collar defendant:

> [I]f ever a man is to receive credit for the good he has done, and his immediate
> misconduct assessed in the context of his overall life hitherto, it should be at the
> moment of his sentencing, when his very future hangs in the balance. This elementary
> principle of weighing the good with the bad, which is basic to all the great religions,
> moral philosophies, and systems of justice, was plainly part of what Congress had in
> mind when it directed courts to consider, as a necessary sentencing factor, the history
> and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal quotations

omitted).

As detailed below, a review of John Fry's character – amply supported in the PSR and

through the many letters to the Court on his behalf – demonstrates that Mr. Fry is a

fundamentally kind, generous, and decent human being. He is an earnest, sensitive and dignified

man, who lives a modest, quiet, and simple life. He is intensely focused on his friends and loved

ones and is universally regarded by them as a rock of support and loyalty.

**DEFENDANT'S SENTENCING MEMORANDUM**                                                7

Simply put, when beginning to think about fashioning an appropriate sentence for Mr. Fry, we hope and trust that the Court will examine his character and find that it weighs heavily in Mr. Fry's favor.

## MR. FRY'S EARLY BACKGROUND

Mr. Fry grew up in a restrictive home with his mother and father, who became a Southern Baptist minister until his retirement when his father became a probation officer.  PSR ¶ 40.  His father's decision to become a Baptist minister created a nomadic life for the family requiring them to move every two to three years.  His father's involvement in the mission meant that his father would move the family to a town where he would get a church up and running to hand off to someone else and then move the family to the next town with the same goal. *Id.*  For Mr. Fry, this was difficult because he wasn't able to have any long-term friends or develop roots, which he desperately sought.  Instead, he found himself living in Ohio, Florida, Alabama, Indiana, Illinois, and California.  *Id.* Though his basic needs were cared for, Mr. Fry's childhood was dictated by his father's religious work, and it did not allow him to have a normal childhood due to the constant moving. His father was not emotionally present as the church came first and Mr. Fry suffered as a result of not receiving the attention that he needed and the support he craved. *Id.*

During his childhood, Mr. Fry was disciplined by his father who used a belt or paddle on him for supposed misbehavior. His father was strict and severe with punishments at time and did not accept excuses. Mr. Fry was left with bruises and welts at times, though the police were not involved, and his mother never interceded to protect him.  PSR ¶ 42.

Mr. Fry was very close to his mother both as a child and until her death.  When she

passed, her death was devastating for Mr. Fry, and it took an emotional toll on him.  In

describing his love for his mother, he wrote,

> To say I loved this woman is simply not enough. I cherished her. I
> watched her struggle with mental health issues that were never addressed,
> simply because we were 'pillars of the community,' and pillars, didn't
> have depression. They didn't have the luxury of seeking psychological
> help. But she remained constant, though at times withdrawn. But it was
> not until I became an adult, that I understood what she was going through and
> why. She was a strong and powerful woman, until all of a sudden she
> wasn't. She worked through it, and our 'normal' life resumed. Sometimes
> hours, sometimes days, and sometimes it took weeks.
>
> Though she had been sick for quite a while, she fought. Fought for
> everything she believed in and for everything she wanted. She waited for
> me when the time came. Waited for me to get back to Indiana from
> California. I arrived in the middle of the night. My cousin, Susan (an RN)
> was by her side, as she had been for the month prior. Susan said mom had
> been asleep for the last few days, but when I walked into the room to see
> her and began speaking with Susan, mom woke up. She grabbed my hand,
> with a faint whisper said "I'm glad you're home, I love you," and she
> passed during the early morning hours.

PSR ¶ 41.

## MR. FRY'S ADULT YEARS

Mr. Fry married in 1985 but the marriage lasted only one year.    Shortly after Mr. Fry

divorced, he came out as gay, and lost countless friends succumb to the AIDS epidemic in the

1990s including his first partner.  PSR ¶45.  The losses were enormous and devastating for Mr.

Fry and they've had an immense impact on him.  He focused on educating himself on how to

stay healthy and volunteered with the AIDS Emergency Fund to become an ardent fundraiser and

supporter of those that needed financial help.  He served on its Board of Directors.  *Id.*

Mr. Fry's marriage produced a son, Ryan, whom Mr. Fry raised with his partner.  Mr. Fry

recalls their life together as great with his son never mentioning that he had a problem with his

father being gay and living with his partner.  As a senior in high school, his son went back to Indiana to visit family and abruptly never returned to California causing enormous distress for Mr. Fry.  Their relationship still exists but consists of mainly the occasional text on holidays or birthdays.  The loss of a close relationship with his son has deeply hurt Mr. Fry.  PSR ¶ 46.

When Mr. Fry finally came out, his parents would not speak to him.  His father told him, "that in the eyes of God, he would have to disown me" and that is what his father did.  His mother was devastated but "always knew" and would secretly call her son when his father was not at home.  Eventually, she was able to tell him that she loved him, no matter what.  And, his father got to a place where he could accept his son.  The process was difficult for Mr. Fry because he loved his parents, but he felt that he needed to be true to who he is.  Luckily for him, his parents managed to find their way back to their son.  PSR ¶48.

Mr. Fry's career has included many years of public service.  In addition to his position with the IRS-CI, he worked to help collect child support working for the county family law courts.

## **LETTERS OF SUPPORT**

What is remarkable about the support that Mr. Fry has received is the number of former co-workers from the IRS-CI who have come out in support of him.  This includes Special Agents and other Investigative Analysts.  Their words are significant because they describe the man, John Fry, and his dedication that he exhibited at his job.  In a word, they all stand by him to this day, despite their understanding that he exhibited a lapse in judgment.  Our memorandum quotes from them liberally, because their words put into context what Mr. Fry was trying to do before he disclosed this information to Avenatti.  They also describe how supervisors and management crushed the spirit of the CI unit and how Mr. Fry, in particular, was treated.

Erica Britton, a retired Special Agent for the Internal Revenue Service, Criminal Investigation where she worked for 26 years, worked with Mr. Fry for the entirety of his career with the IRS-CI.  She writes,

> John played a critical support role in many investigations conducted by our office. In addition, John provided support to the Santa Rosa office and, at times, to the entire Field Office to include Oakland, San Francisco, Sacramento and Fresno offices.
>
> * * * * *
>
> The database analysis conducted by John was the foundation of the Task Force's work.
>
> * * * * *
>
> In the approximately 7 years that I worked with John Fry, both as part of his work for the Task Force and his support of other investigations in our San Rafael Office, I always found him to be a nice, honest, dependable, trustworthy, hardworking employee.  He was very knowledgeable about his work and if he did not know something he would not hesitate to ask.  He was extremely dedicated to his work and at times I found him working beyond his 8 hour day.  If I needed something quickly, he was always there to provide it for me, even after his 8 hour day.  He was always upbeat, positive, exuberant and happy about the work he did.  He was extremely reliable and always finished his work above and beyond what was asked and ahead of all deadlines. He also volunteered to take on jobs that were not required of him.  He taught classes on certain databases that he had learned, he did role playing for our building entry training which required long hours that went uncompensated, assisting on very early morning warrants.  He was always offering his assistance.  He was one of the most hardworking employees that I have ever worked with.
>
> Unfortunately, during my last few years at the IRS, I also watched a significant decline in the overall performance and morale of the agency in our Northern California Field Office, largely due to a new management.  The management included a new Special Agent in Charge (SAC) and Assistant Special Agent in Charge (ASAC) along with a few Supervisory Special Agents (SSA).  In my opinion, it was the poorest management I had suffered in my career as a Special Agent.  Based on my direct experience and my observations of the management of other staff, particularly John Fry, I believe that John would have feared recriminations or reprisals had he taken his concerns about potentially missing records through official channels.  John was one of many who worked under constant criticism from management regarding day-to-day matters.  The criticism undermined employees' confidence in the IRS's ability to treat them with dignity, respect and integrity.
>
> In particular, I was appalled by the management style of John Fry's direct supervisor which I can only describe as awful, both towards John and many other staff members in our office as well as other offices in the Field Office.

* * * * *

I understand that there is a protocol to report concerns, and I understand that John made a serious mistake in going outside of the protocols.  However, I believe the climate of constant criticism experienced by John contributed to his mistake.  It made it difficult to follow the proper protocols with any confidence that concerns would be properly addressed and that the reporting IRS employee would be protected from potential reprisals.

I also believe that I know John well based on our long professional association and the friendship that followed.  I believe him to be a man of good character, whose out-of-character actions have brought him before the court, and that nothing like this will ever happen again.  I trust him and if ever the chance would work with him again.

Michael Hammond, Mr. Fry's co-worker at the IRS-CI for 11 ½ years, writes,

I've known and worked with John for the last 11.5 years, and had consistent interactions with John both in and out of the office.

Through his work in the office, I've been witness to his great accountability, always positive attitude, and initiative through the years. His drive and enthusiasm inspired many coworkers, and his constant support to the mission resulted in removing many bad people from the streets. Outside the office, as well as in the office, John always showed utmost positivism in all things he encountered. John was one of our best analysts and was highly regarded by those he worked with.

I don't know exactly what he was thinking when he made the wrong decision, be it stress or distrust of his leadership, but his regrets of making that decision is present. I do know that John has already suffered greatly by losing his career, and several close friends and coworkers.

Matthew Ward, Mr. Fry's co-worker at IRS-CI where they worked together on the North Bay BSA Task Force for several years writes of Mr. Fry,

During our time working together in various capacities, I witnessed first-hand John's commitment to the mission in both his regular duties, and through all of the collateral duties he took on voluntarily.  We both volunteered every year to assist the agents in their annual Building Entry Training.  Even after it was no longer part of his job description to do so, John continued to volunteer for the long hours involved in participating in search warrants and continued to help with annual equipment and tax return inventories.

In short, John was both proud and happy to serve, and in doing so enjoyed the admiration and respect of our colleagues in the Oakland Field Office, which was reflected in years of nearly perfect or perfect annual evaluations from his supervisors,

DEFENDANT'S SENTENCING MEMORANDUM                                         12

with the exception of his most recent, Cindy Chen.  I mention this point because, it was during those last couple of years that a good number of individuals within the field office began to question the competency of leadership, which was not only reflected in annual agency surveys, but through evaluations conducted by headquarters, as well as multiple grievances against said leadership, but also in the volume of agents and support staff that left in that short period.  Despite these difficulties in the field office, up to my own separation I saw John continue to persevere and work with the same dedication that he always had.

On the personal front, I have known John to be equally dedicated to the well being and happiness of his own family and friends, often sacrificing of himself to help somebody in need. We have remained close, and I have seen him carry the weight of his decision with much reflection and reverence.  He is now making every effort to move forward with a new career and to put past events behind him.  The damage done to his reputation and the fact that he can no longer serve as a member of the law enforcement community is a weight that he continues to carry.

In conclusion, in my experience John Fry has been a servant of the law enforcement community and an upstanding human being who has always tried to do what is best.  I can say with confidence that the decisions made by John were void of malicious or criminal intent.  Between what I know of John, and the fact that he chose to remain anonymous and sought no compensation, I believe that his only intent was to act as a whistleblower.

Amjad Qaqish, worked as a Special Agent for the Department of Treasury for over 20 years and worked with Mr. Fry for the past couple of years.  He writes,

I have known John to be a person of good character and high ethical standards.  John was zealous about his job and carried out his duties with professionalism and enthusiasm.  John always took his job and duties very seriously and performed his work tasks with great diligence.  John has done research for me and many of my colleagues on many cases and always provided me with professional, comprehensive and timely reports.  John often when up and beyond the call of duty to ensure that his reports were comprehensive and on point.  Often times John found and provided information that other's missed.  John was always a wealth of knowledge and made connections relating to other cases that no one else made.  I often saw John staying at his desk during lunch and working.  Many of my colleagues and I feel that John was one of the hardest working Investigative Analyst around and we often went to him rather than going to others because of his timely and comprehensive work.

Tamara Williams, a Special Agent with the Internal Revenue Service, Criminal Investigations who also led a task force at the Marin County District Attorney's Office, worked with Mr. Fry from 2007-2010 when he was assigned as the IRS Investigative Analyst assigned to

the task force.  She got to know Mr. Fry very well both professionally and personally and she

writes,

> I worked with John from 2007 through 2010. At the time, I was a Special Agent with
> Internal Revenue Service, Criminal Investigation. I have since retired. During that time,
> I led a task force located at the Marin County District Attorney's Office. John was the
> IRS investigative analyst assigned to the task force. I got to know John very well both
> professionally and personally.
>
> John was extremely proficient in fulfilling his duties with the task force. He was bright,
> friendly, honest and dedicated in the performance of his job. John was very law and
> order oriented. He took his job seriously, and he always tried to do his very best. John
> was more passionate about his job than anyone I have ever known.
>
> I was unaware of the fact that John released Bank Secrecy Act information until I read
> a news article. John later expressed to me that, at the time, he believed he was doing the
> right thing. John now acknowledges that he did not have all of the facts and that he
> made a poor choice in following the course of action that he did. He has also accepted
> responsibility for his actions.

Kirk Tambornini, who also worked as a Special Agent with IRS-CI, worked with Mr. Fry

and he writes,

> I hope that Judge Chen will consider John's long and dedicated service to the Federal
> Government in his sentencing decision.  John was always passionate about the work
> he did for the government.  In his position as an Investigative Analyst, he provided
> investigative support to me in my position as a Special Agent with IRS-CI.  He was
> always responsive to my requests and the requests of other Special Agents for
> investigative support.  I could always count on him to get me the information I
> needed.  He put in long hours and loved working in law enforcement and I know he
> truly regrets that he is no longer able to work in this field.  Although John may not
> have used the proper whistle blower procedures,  recent political events suggest the
> current government whistle blower program may not be adequate to protect the whistle
> blower and this could have played a role in John's decision to go outside the
> government with his information.

Mr. Fry's current employer describes Mr. Fry with the same zeal that his fellow IRS-CI

co-workers did.  Jeffrey Senkir, the owner of Senkir Design Inc, and the current employer of Mr.

Fry writes,

> I hired John C Fry as an operations manager to take responsibilities off me of running

the business in April of 2019. . . . Since working together, John has become integral in the daily workings of the business and he has assisted and advised me in ways to help refine grow the business. His skill in anticipating, recognizing and solving issues before they become problems is invaluable. He consistently is learning better and more creative ways to handle tasks at hand and he has been a strong force in refining the daily workings of my business.

I trust John explicitly with my business. Part of the reason he was brought on was a need to step back from the business and focus on some personal issues. I needed someone that I could trust with everything Senkir Design without having to be part of the day-to-day operations of the business. I found this in John. John is one of those people that come around only once in a great while: he is honest, forthright, humble and conscientious just to name a few of his attributes. He brings these characteristics into everything he does.

John's makes coming to work at Senkir Design Inc. smooth and fun, his persistently positive attitude is infectious and his professionalism is superb. I am blessed to be working with Joh n on this venture of mine. I see him as an equal and as someone to aspire to.

Jim Roberts, the owner of the Madrones & the Brambles, and Mr. Fry's former employer writes of Mr. Fry,

He was dedicated, hard working, honest, kind and always had a positive attitude regardless of the task at hand.  Please note that many of our projects were both mentally and physically challenging, and John's bright disposition was an inspiration to others.  He promoted through the company quickly and was rewarded for his accomplishments and efforts.  When John was hired at the IRS almost ten years ago, I was interviewed as part of his security clearance.  Though I don't know the complete details of his case and what transpired, I can say from my unique position and history with Mr. Fry that I am deeply saddened to learn that some possible poor judgement on his part has put him in such a seriously grave place.  I can say without any question, that John is not a malicious person by nature.  I would have seen that in the years he worked for me.  I can say that I could imagine him trying to do the right thing in a difficult situation and not make the proper choices because he was caught up with emotion and passion.  As average Americans living through these difficult times, the best of us question what the right course is anymore.  I understand that what John did was wrong, but I hope that the court will take into consideration his intentions, his heart and the overwhelming good that he usually does for his family, his friends and his community.  He will be of much greater service to this world being in the community and monitored by the courts than in a prison, costing tax payer money.

In addition to the respect and love that Mr. Fry's co-workers and employers feel toward

him, Terry Fry, Mr. Fry's only brother writes,

> He has always been an upstanding, honest, caring, and trustworthy person. He has helped me through some of the most trying times in my life and has always been there to advise, help, and support me, even when I didn't deserve it.

> In 2014 I was involved in a near fatal motorcycle accident, in which I lost my left leg, back in Indiana where I lived at the time. John was right there calling and checking up on me daily. He even flew out to Indiana to visit me once I came home from the hospital. He was emotionally and physically supportive throughout my entire ordeal. My family and I even moved out here to California so that we could be close to him.

> It comes as no surprise that John is willing to take responsibility for his actions. Despite the current situation, I still believe him to be an honest, trustworthy, and law-abiding citizen.

David Lindsay, Mr. Fry's former husband of 22 years and friend of 30 years writes,

> I have always known John to have the highest of work ethics and generally above and beyond job description and pay grade.

> * * * * *

> John and I raised his son, Ryan, and have produced a well adjusted hardworking farm boy with home and family unreliant on parental assistance, which, in this era of societal breakdown is something we're both very proud. John was always a responsible bread winner and loyal partner. He remains to this day my very best friend. I have always found John to be truthful and loyal and responsible.

Alejandro Roura, Mr. Fry's partner of the last 6 years writes,

> There are many reasons why John felt he couldn't go to his superior ASAC Cindy Chen, and trust her with this information. John has had many supervisors at CI over the years, which in itself becomes counterproductive for the agency, since they have a new boss every couple of years. It takes a long time to learn all the intricacies involved in such a big operation so by the time they get enough of a grasp to make real positive change, they transfer and a new supervisor comes along.

> John's always been able to do his job and do it effectively, above expectations, in spite of all this change and has been very proud of his outstanding reviews. He has earned the respect of his colleges at CI and other employees from various agencies with whom he works. In all that time, he's never had a bad review in regards to his performance or results. He's never had a superior that not only seemed incompetent, but her lack of knowledge about the inner workings of the agency was frustrating and appalling. She never seemed to fully grasp what John's job entailed and proceeded to challenge his

decisions and process, affecting the overall progress. She then proceeded to reprimand him for her perceived lack results for the same progress she had been hindering. Not only did she give John his first bad performance review, which was unwarranted, she forced him to remain in a post of duty far from where he lived even though John had requested a location closer to his residence. Later, she did change his post of duty, but to San Francisco, not the one he requested in Santa Rosa.

Ms. Chen took away his government car forcing him to use his personal one for travel for work and many other things that seemed petty and vindictive. John had to file a grievance against Ms. Chen, but as it turned out, the person to handle that grievance was Ms. Chen herself. John tried to go to Ms. Chen's supervisor, the SAC, but he proved himself to have no integrity. He told John he agreed with him but he had to support the ASAC. It became apparent that John couldn't rely on Ms. Chen or her superior with any sensitive information or that they could be trusted to do the right thing. I am also aware of other employees having similar issues with Ms. Chen.

* * * * *

It is a shame that probably many of the people involved in this case will judge John solely based on the limited information they'll have of him or lack thereof. Which doesn't even come close to painting a full picture of who he is. Which is a loving, caring, trustworthy man who will always stand for what's right, even if it means risking himself for the greater good. He's always quick to help a friend in need or his brother, family and in-laws providing them with a place to stay with us. when they were evacuated from Santa Rosa because of the fires up north. Or taking excellent care of me after shoulder surgery last November, when I couldn't work or do much for myself or after my heart attack a month ago, if it wasn't for him, I probably wouldn't be alive to write this letter. Or housing my family, when they came to visit last minute for Thanksgiving, after my heart attack scare, etc.

Mr. Fry's friends also describe a man of dignity, humanity, and loyalty.[3]  W. Dan Houck, a longtime friend of Mr. Fry, writes,

When my Loretta suffered a Traumatic Brain Injury in April of 2015 I learned what true friendship was. John immediately opened his home to me in Santa Rosa so that I could be close to my best friend in the hospital. He had an extra set of keys made and gave them to me with the instruction that it was my home to use whenever I needed. He visited us in the hospital and was always available with a shoulder for me to cry on. I stayed at his house many times over the following 15 months. He never complained about this major disruption to his life and always greeted me with a cheery "Hay Danno, how ya doing handsome?" After Loretta died in 2016 John supported me by listening, reminiscing and distracting during a very dark time for me.

---

[3] Additional letters have been included in Exhibit A but have not been quoted in this Memorandum.

**DEFENDANT'S SENTENCING MEMORANDUM**                                        17

There is more that I could add like his going to our place in Yorkville to take care of my dog and cat, checking on the ranch that I care take and other small kindnesses that made an awful time easier. I could talk about his infectious laugh and ready hugs. His righteous indignation at public scandals of people behaving poorly and taking advantage of others weaker than themselves. There is much about John that I could recommend as an example of a good citizen and a great friend.

Captain Fal Allen of the Anderson Valley Fire Department, who has known Mr. Fry for 10 years writes,

… we have discussed his desire to be engaged and to try and make the world a better place.  He has taken a special interest in our community and participated in community events and projects to make Anderson Valley a better place to live.  John has shown himself to be trustworthy, honest and dependable.

John Cardani-Trollinger, another friend, writes,

I work in Cyber-Security marketing for some of the largest names in global IT companies. I am the son of a police officer and a schoolteacher. I share this because I have an intrinsic understanding of what public service means to our country and society as a whole.

* * * *

I believe very strongly that Johns conduct was out of character for him in action. His intent is always good…as most of us try to be. However, we all make mistakes.  I remember my Dad, a police officer, once telling me, "There are criminals, and there are people who make mistakes.

Yvonne Driver, a friend for over 20 years, writes,

He has been an integral part of my life for all of that time and consider him like a brother now and will always be.

John is a good friend, a caring friend and someone that I could call day or night in time of need and he will be there.  He is loyal and funny, caring and giving.  Personally, he is everything you would want in a friend and a brother.

I  have seen many times how dedicated he is to his job both at the IRS and his previous job, Taylor Roberts.  He would go out of his way to complete a project no matter what it took.  I did not work with him at his jobs but I have seen how dedicated he was and heard the same from mutual friends that he works with.

Teri Tollenaere, a 25- year friend of Mr. Fry's, writes

**DEFENDANT'S SENTENCING MEMORANDUM**          18

1
2
3

In all the time I've known John, 25 years now, I've known a passionate, positive, thoughtful and hard working man.  Whether it was helping single mothers get the support they need for the DA's office in Mendocino County, or assisting the deaf with sign language  in SF, John's always had the greater good in his sights.

4
5
6
7

I'm saddened to hear of John's wrongdoing.  John has a passion for what is right and it appears that clouded his judgment. When sentencing please consider the best possible outcome for the community regarding John's rehabilitation.  It's my strong belief that he will do more good work in society than incarcerated.  Thank you for your consideration, deep down John is truly a man who wants to do the right thing, and always has been.

8
9

Joseph Anthony Trivetti-Salvat, Mr. Fry's friend, writes,

10
11
12
13
14
15

I have known John for nearly 4 years, and in that time I have come to be such close friends, he is almost like a brother to me. He was the first friend I ever made here in San Francisco. He has become like a role model to me. Just a quick example, when I was hospitalized about 3 years ago with double pneumonia for about 2 weeks, John was the first one to rush to the hospital and stayed with me and/or visited for a few hours out of his busy day just to make sure I was in good spirits because he told me, "nobody should be alone in the hospital". I can't thank him enough for that. I will never forget that moment. It brings me to tears that I have such a beautiful friend in my life.

16
17
18

I'm not sure of the letter-to-letter specifics of this entire case, but I do know this: John C Fry has more honesty, integrity, and heart in one finger than most people have in their whole body. I can't emphasize enough what positive impact he has made in my (and many others) life.

19
20

I can tell you for a fact that John does NOT do things for personal gain, nor does he do things in defiance. John C Fry does things because it is the right thing to do. That is his code for living life. I strive to be more like that in my own daily life

21
22
23

Robert Trivetti-Salvat, Mr. Fry's friend of 8 years and a former Army officer and Wet Point graduate, writes,

24
25

Mr. F1y has revealed to me that he faces serious charges related to mishandling confidential information related to Michael Cohen and First Republic Bank. On his behalf, I can offer an endorsement of Mr. Fry's good character without reservation.

26

* * * *

27
28

Having held Secret and Top Secret-SCI clearances for years in the Army, the

**DEFENDANT'S SENTENCING MEMORANDUM**                                    19

seriousness of Mr. Fry's fiduciary duty is well-understood. Although I do not know any specifics of what wrong actions were taken beyond what has been published in The New Yorker, I do believe Mr. Fry's actions had tl1e right intent to escalate potential wrong-doing.

As someone who held the responsibility of training others with similar fiduciary duties in the Army, I cannot help but wonder if there was insufficient guidance or training given to Mr. F1y. That thought comes to mind as I cannot imagine Mr. Fry taking a wrong action when knowing the right one regardless of possible personal gain or personal sacrifice.

## **NEED FOR DETERRENCE**

There is no need for specific deterrence or protection of the public through incapacitation, *see* Section 3553(a)(2)(C), in this case. Aside from the conduct at issue here, Mr. Fry has never had any brush with the law and there is no reason to believe that he will have any in the future. Mr. Fry's reputation has been ruined by the public nature of the government's investigation and prosecution and the felony conviction and it is highly unlikely that he will ever be able to hold a job like he had at the IRS-CI, a job and career he loved.

Many courts have discussed general deterrence, *see* Section 3553(a)(2)(B), and as a general matter, deterrence is better achieved through the likelihood, rather than the length, of punishment. *See, e.g.*, Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (Oct. 2005) ("Research has found that offenders are more sensitive to the probability of punishment than to its severity. . . . White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty.").  Where, as here, the mere fact of a public prosecution rather than diversion, the loss of a career, the collateral consequences imposed by a felony conviction, these all serve as deterrence.

Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one.  But the question for the judge is "marginal deterrence," *i.e.,* whether any particular quantum of punishment results in increased deterrence and thus decreased crime.  Here the findings are uniformly negative: there is no evidence that increases in sentence length reduces crime through deterrence.  Current empirical research on general deterrence shows that while *certainty* of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006).

In one of the best studies of specific deterrence, which involved federal white-collar offenders (presumably the most rational of potential offenders) in the pre-guideline era, no difference in deterrence was found even between probation and imprisonment.  *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes,* 33 Criminology 587 (1995); *see also* Zvi  D.  Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-498 (2007), ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J.

48S, 50S-51S (2011).

With regard to general deterrence "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." *See* Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al, *The Missing Link in General Deterrence Theory,* 43 Criminology 623 (2005).

Further problematic with justifying punishment as a means to deter others, besides its ineffectiveness, is that it is immoral to punish one person merely to promote deterrence of others. "Juridical punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, The Science of Right 195 (W. Hastie trans., 1790).

Balancing the ineffectiveness of and ethical problems with general deterrence against the financial costs to society of imprisoning an individual ($25,895 per year) [4], should lead this Court to conclude that general deterrence is not a good reason for imposing any prison term in this case on Mr. Fry. *See United States v. Cole*, slip op., 2008 WL 5204441 *6-7 (N.D. Ohio Dec. 11, 2008).

## **ABERRANT BEHAVIOR**

This Court can grant a variance based on the aberrant nature of Mr.

---

[4] Costs of Imprisonment Far Exceed Supervision Costs (May 12, 2009), http://www/uuscourts/govNews/View /09-05-12/Costs_of_Imprisonment_Far_Exceed_Supervision_Costs.aspx

**DEFENDANT'S SENTENCING MEMORANDUM**                                    22

Fry's conduct. *See, e.g.*, *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

Mr. Fry not only lost his job - but he has also lost his personal reputation in the community that he spent his entire life building. Moreover, there has been media scrutiny of Mr. Fry personally and his friends and colleagues have been contacted. This Court can consider Mr. Fry's loss of profession and reputation, *see, e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction), as well as the exceedingly harsh psychological consequences of this case on him.

////

////

## <u>CONCLUSION</u>

It is for all of these reasons that imposition of a sentence of probation without electronic monitoring and a low-end guideline fine of $2000 is a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.  Defendant urges the Court to impose this sentence.

Dated: January 12, 2020                                   Respectfully submitted,

/s/ Gail Shifman

_____

GAIL SHIFMAN

Attorneys for Defendant
JOHN FRY

### REQUEST TO FILE EXHIBIT B UNDER SEAL AND
### DECLARATION OF GAIL SHIFMAN

Now comes Gail Shifman, under penalty of perjury, who states as follows:

1.      I am the attorney of record for Defendant John Fry.

2.      The government provided discovery to the defense which included Bates JF-00158 (provided via a protected order) and JF-00195.  Portions of JF-00195 have been included in the Sentencing Memorandum and Exhibit B, JF-00158 has been referred to and summarized and is attached and requested to be filed under seal as Exhibit B.

3.      Exhibit B is a SAR report which contains confidential financial information about various subjects.  Disclosing the contents of these records is a crime and for this reason, we are requesting an order permitting its filing under seal.

Dated this 12th day of January 2020.

_____
GAIL SHIFMAN

**EXHIBIT A**

**LETTERS IN SUPPORT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B**

**SAR**
**FILED UNDER SEAL**